BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
ARUN G. RAO
Deputy Assistant Attorney General
AMANDA N. LISKAMM
Director, Consumer Protection Branch
RACHAEL L. DOUD
Assistant Director, Consumer Protection Branch
ROWAN L. REID
Trial Attorney
Consumer Protection Branch
Civil Division, U.S. Department of Justice
450 5th Street NW, Suite 6400-S
Washington, DC 20530
Telephone: (202) 532-4315
Facsimile: (202) 514-8742
Email Address: rowan.l.reid@usdoj.gov
*Attorneys for Plaintiff United States of America*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 8:24-CV-1 |
| Plaintiff, | |
| v. | COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTIES, AND OTHER RELIEF |
| RESPONSE TREE LLC, a California corporation; and | |
| DEREK THOMAS DOHERTY, individually and as an officer of RESPONSE TREE LLC, | |
| Defendants. | |

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC"),

pursuant to Section 16(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1.     Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105, to obtain a permanent injunction, civil penalties, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule (the "TSR"), as amended, 16 C.F.R. Part 310.  Defendants violated the FTC Act and TSR by operating a deceptive lead generation business that resulted in millions of unlawful telemarketing calls based on invalid consumer consent.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

3.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1), 1391(b)(2), 1391(c)(2), 1391(d), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.     This action is brought by the United States of America upon referral from the FTC.  The FTC is an independent agency of the United States Government created by the FTC Act.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. § 6102, and the TSR, 16 C.F.R. Part 310, which prohibit deceptive and abusive telemarketing acts or practices.

## DEFENDANTS

5.     Defendant Response Tree LLC ("Response Tree") is a California corporation with its principal place of business as 3333 Michelson Drive, Suite

300, Irvine, CA 92612. Response Tree transacts or has transacted business in this District and throughout the United States. Response Tree has owned, operated, and controlled the internet domains PatriotRefi.com, AgedPeopleMeet.com, ClickToWinAChance.com, and others. Response Tree took PatriotRefi.com, AgedPeopleMeet.com, ClickToWinAChance.com, and other domains down after receiving the FTC's Civil Investigative Demand, which indicated that the FTC was investigating Response Tree for potential violations of the FTC Act and TSR. At all times relevant to this Complaint, through internet domains it has owned, operated, or controlled and other means, Response Tree, acting alone or in concert with others, has acquired personally identifiable information from consumers throughout the United States. Response Tree has then advertised, marketed, distributed, or sold that consumer information to third parties throughout the United States.

6. Defendant Derek Thomas Doherty ("Doherty") is the President and managing member of Response Tree. At all times relevant to this Complaint, acting alone or in concert with others, Doherty has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Response Tree, including the acts and practices set forth in this Complaint. For example, Doherty has led and continues to lead the development of Response Tree's business strategies. Doherty has signed contracts on behalf of Response Tree. Doherty has, in response to consumer complaints, signed declarations attesting to the functionality and content of Response Tree's websites that acquire information from consumers. In connection with the matters alleged herein, Doherty transacts or has transacted business in this District and throughout the United States.

## COMMERCE

7. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES
### Overview

8.    Defendants have operated as lead generators that collect, aggregate, and sell consumer information—or "leads"—for profit.  More specifically, Defendants have operated as a "consent farm," collecting and selling leads that are coupled with the consumer's purported consent to receive certain outbound telephone calls, including outbound telephone calls that deliver a prerecorded message, otherwise known as robocalls, and calls made to telephone numbers on the do-not-call registry established by the TSR (the "National Do Not Call Registry" or "Registry").  Intermediaries, sellers, and telemarketers have purchased Defendants' leads and relied on this purported consent when calling those consumers.  Any purported consent that fails to meet the requirements of the TSR, however, is invalid consent.  As such, any outbound telemarketing calls for which consent is required, including robocalls and calls made to telephone numbers on the National Do Not Call Registry, that are placed based on invalid consent are illegal under the TSR.

9.    The primary method by which Defendants have obtained consumers' information and purported consent is by operating websites that have deceptively induced or been likely to induce consumers to disclose their personal information.  Since at least 2019, Defendants have owned, operated, and controlled more than 50 such websites.

10.    Defendants have sold the data they gather to numerous partners or clients.  Defendants' clients typically have been intermediaries that resell the data to the actual sellers of goods and services.  Defendants' clients, or more often their clients' clients, then inundate consumers with outbound telephone calls (including robocalls and calls made to telephone numbers on the National Do Not Call Registry) relating to a multitude of products and services, including solar panels, hearing aids, auto warranties, and social security disability services.

11.     Defendants have sold consumer data for prices ranging from less than one cent per lead to more than one hundred dollars per lead.  Volume, price, and frequency have been among the terms that Defendants negotiate with their clients when selling leads.  Defendants have sold both "aged" leads (leads based on past consumer activity) and "live" or "real-time" leads (leads that are available contemporaneously with the consumer's activity).  The prices for live or real-time leads are significantly higher than those for aged leads.  At their peak, Defendants had an average of 10,000 real-time leads available to sell each day and, on exceptional days, Defendants have had up to 50,000 real-time leads available to sell.  Between 2019 and 2022, Defendants sold millions of leads.

12.     Defendants have sold leads obtained through their websites to clients who use the leads for telemarketing campaigns.  For example, between January 2018 and May 2021, more than 85,000 outbound telephone calls were made to consumers based on the leads and purported consents obtained through just one of Defendants' websites, PatriotRefi.com.  All or almost all of these calls were robocalls.  More than 55,000 of those calls were made to phone numbers on the National Do Not Call Registry.

In addition, in numerous instances, Defendants sold leads that they misrepresented as having been obtained through their consent farm websites.  Defendants took consumer data they had obtained through other sources and falsified metadata to make it look like the consumer data was obtained through their websites.  Hundreds of thousands of calls, including robocalls and calls made to phone numbers on the National Do Not Call Registry, were made to consumers based on Defendants' falsified leads.

## **Defendants' Unlawful Consent Farm Websites**

*PatriotRefi.com*

13.     Since at least 2020, Defendants have owned, operated, and controlled the domain PatriotRefi.com ("Patriot Refi Website").  Defendants took down the Patriot Refi Website after February 1, 2023, following Defendants' receipt of the FTC's Civil Investigative Demand indicating that the FTC was investigating Defendants for potential violations of the FTC Act and TSR.  The Patriot Refi Website purported to pair consumers with lenders so that the consumers could refinance their mortgage to "lower [their] monthly payments and save thousands."  The Patriot Refi Website also purported to help consumers "get a quote to purchase a home, or take cash out of [their] existing home."  The Patriot Refi Website misled or was likely to mislead consumers into providing personal information and providing consent to be subject to telemarketing and robocalls because the provision of such personal information and consent was presented as necessary to obtain the website's services.  Below is an image of the Patriot Refi Website Homepage, labeled as Image 1.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Image 1: Patriot Refi Website's Homepage

14.     At the bottom of the Patriot Refi Website's Homepage, there was a prominent blue button that stated "GET YOUR FAST FREE QUOTE."  When a consumer clicked on this button, the webpage was reoriented on the browser so that the portion of the homepage with a black box and the words "START HERE. Get a FREE quote in minutes.  Tell Us About Yourself." was at the center of the browser.

15.     As such, to obtain services, the consumer was prompted to type his name, address, phone number, email address, and date of birth into the form in the black box. The consumer submitted his information by clicking the prominently displayed large blue button in the black box that stated, "GET YOUR FAST FREE QUOTE." If the consumer did not fill in all the fields on the form requesting his personal information and then tried to click the "GET YOUR FAST FREE QUOTE" button, a pop-up that said, "Please fill out this field" appeared over the field in which the consumer did not enter information. The consumer was unable to click through the button until after all of the requested personal information was typed in. The portion of the homepage containing the black box is visible in Image 1 above and is significantly enlarged as Image 2 below.



Image 2: Patriot Refi Website's Consumer Submission Portion of the Homepage

16.     When the consumer clicked the blue "GET YOUR FAST FREE QUOTE" button to submit his information, a new blank webpage was opened. The blank webpage had a URL of https://PatriotRefi.com/thank-you.php. This webpage did not provide consumers with a quote to refinance their existing home,

to purchase a new home, or to take cash out of their existing home.  Indeed, many or all consumers never received any quote at all.

17.     Meanwhile, on the back end, Defendants operated and maintained an electronic database of lead generation information instantaneously extracted and compiled from the Patriot Refi Website via the consumer's use and input of data on the Patriot Refi Website.  The database contemporaneously recorded and saved the date and time when the consumer clicked the blue "GET YOUR FAST FREE QUOTE" button and assigned the consumer a unique identifier.  The consumer's information was automatically captured and populated into the database.  Defendants then sold this information to a variety of partners, many of which have either sold or marketed products or services completely unrelated to home mortgages or lending.  The lead generation information collected from the Patriot Refi Website and subsequently sold by Defendants includes information such as the consumer's name, address, phone number, email address, date of birth, IP address, and the date the consumer accessed or submitted his information to the Patriot Refi Website.

**Defendants' Use of Dark Patterns on PatriotRefi.com**

18.     Defendants' Patriot Refi Website operated as a consent farm by purportedly gathering "opt-in" or "consent to be contacted" data used by telemarketers to justify placing outbound telephone calls, including robocalls and calls made to telephone numbers on the National Do Not Call Registry, to those leads.  However, the website did not provide clear and conspicuous disclosures that are necessary to satisfy the consent provisions of Section 310.4 of the TSR.

19.     Defendants used numerous techniques to dupe consumers into providing their purported consent through the Patriot Refi Website, including:

- Obtaining consumers' purported consent through subterfuge by disguising consumers' consent to be contacted as a request for home mortgage financing quotes;

- Concealing key disclosures by presenting them in small text that was barely legible to the naked eye and hiding these disclosures behind a hyperlink; and

- Using disclosures that contain confusing and contradictory language.

20.     These deceptive practices, sometimes referred to as "dark patterns," are a form of user interface design crafted to manipulate or trick consumers into taking actions that may be against their interest or contrary to their intent.  The deceptive design elements of the Patriot Refi Website undermined consumers' ability to make informed choices about the collection and use of their data and their willingness to receive robocalls, other outbound telephone calls, and other solicitations.

21.     Defendants also concealed key disclosures.  The "consent language" portion of the Patriot Refi Website consisted of a block of text and the hyperlinks embedded in that block of text below the large blue "GET YOUR FAST FREE QUOTE" button.  This block of text is shown in Images 1 and 2 above.  As seen in Image 1, the text was not clear and conspicuous becausethe text was in very small print that was barely legible to the naked eye.  Indeed, Image 2 does not reflect the actual size, but rather reflects a substantially zoomed-in view of this portion of the website.  The text was also significantly smaller than the data input fields and the "GET YOUR FAST FREE QUOTE" button above it.  The text stated:

> By clicking Submit, I clarify that I am a US resident over 18, and I agree to the Privacy Policy and Terms & Conditions.  I agree to receive emails from Patriot Refi and their marketing partners.  I agree to be contacted by [*sic*] and their marketing partners by telephone, which may include artificial or pre-recorded calls and/or SMS text messages, delivered via automated technology to the phone number that I have provided above regarding related products and services.  I understand that my consent is not required to make a purchase or obtain services and that I may opt-out at any time.  Standard Message

& data rates may apply.  Text "STOP" to Cancel.  Text "HELP" for Help.  <u>California Residents.</u>

(emphasis in original).

22.    This block of text confusingly began with "By clicking Submit, … I agree …."  To the extent consumers even noticed and read the small print block of text, it was reasonable for consumers to think that they would only be agreeing to the statements in the block of text by clicking a button entitled, "Submit."  However, no button with the word "Submit" existed on the Patriot Refi Website.  Instead, consumers provided their information to Defendants through the website by clicking the "GET YOUR FAST FREE QUOTE" button, not by clicking "Submit."

23.    The embedded hyperlinks in the consent language on the Patriot Refi Website hid material terms that consumers were purportedly consenting to by clicking the "GET YOUR FAST FREE QUOTE" button.  Each underlined word in the block of text provided a link to additional terms to which consumers were purportedly agreeing.  Consumers were required to click on these words to open a new webpage to view the terms.  The phrases "Privacy Policy," "marketing partners," and "California Residents" contained hyperlinks to webpages entitled "Privacy Policy," "Our Partners," and "California Privacy Notice," respectively.  These webpages contained small print disclosures that are not only too small to read without heavily zooming in but also contained surprising material disclosures.

24.    The "Privacy Policy" webpage, which consumers saw only if they clicked the hyperlink on the main page, was more than ten paragraphs long and displayed in small print.  Buried in the policy was the statement that "Patriotrefi.com may, from time to time, contact you on behalf of external business partners about a particular offering that may be of interest to you.  In those cases, your unique personally identifiable information (e-mail, name, address, telephone number) is transferred to the third party."  This disclosure was different than the

disclosure on the Patriot Refi Website Homepage that stated that the consumer may be contacted "regarding related products and services."  This disclosure was more expansive in that it opened the door for the consumer's contact information to be transferred to marketers of products and services unrelated to those offered by the Patriot Refi Website.  Additionally, this disclosure misrepresented that Defendants, seemingly referring to themselves as "Patriotrefi.com," would contact the consumer about products and services when, in fact, third parties to whom Defendants sell the consumer's information would contact the consumer.

25.    The "Our Partners" webpage, which consumers only saw if they clicked the hyperlink on the main page, listed over 300 marketing partners in small print.  Below is an image of the "Our Partners" webpage, labeled as Image 3.  To review all the marketing partners listed on the webpage, a consumer would have to zoom in, scroll up and down on the webpage, and then scroll left and right on the webpage.  Although PatriotRefi.com presented itself as a website related to mortgage finance and the block of text stated, "I agree to be contacted . . . regarding related products and services," many of the listed marketing partners provide products and services unrelated to mortgage finance, including solar panels, hearing aids, auto warranties, and social security disability services.

1

2

3



4

5

6

7

8

9

10

11

12

13

14

15

16    Image 3: Patriot Refi Website's "Our Partners" Page

17        26.    The "California Privacy Notice" webpage contained information

18    related to the California Consumer Privacy Act.  The webpage stated that the

19    notice was "for California residents and supplements the information contained

20    elsewhere in the Privacy Policy."  It also stated, "To provide the products or

21    features offered by our site, we must process information about you, including

22    Personal Information, and we may sell, share, and use your Personal Information to

23    respond to your request and for business purposes.  For example, if you request

24    information about an insurance product or alternative product, your Personal

25    Information may be shared with third-parties who can follow-up on your request."

26    Contrary to this statement, consumers who submitted their personal information to

27    the Patriot Refi Website received robocalls and other telemarketing calls regarding

28

social security disability benefits, among other topics, which are not at all related to consumers' requests for mortgage-related financial products. Furthermore, in numerous instances, consumers did not receive "the products or features offered by" the Patriot Refi Website.

27. Additionally, the consent language stated, "I agree to the … Terms and Conditions." It is unclear to what "Terms and Conditions" this capitalized phrase was purporting to refer.

28. Defendants' use of these deceptive design techniques on the Patriot Refi Website tricked consumers into providing their personally identifiable information. This undermined consumers' ability to understand that their personally identifiable information would be provided to others as a lead for telemarketing calls, including robocalls and calls made to telephone numbers on the National Do Not Call Registry.

**Defendants Owned, Operated, and Controlled Other Similar Websites**

29. Since at least 2019, Defendants have owned, operated, and controlled more than 50 websites, many of which have operated as consent farms. Defendants' other consent farm websites have included, for example, AbodeDefense.com and TheRetailRewards.com. Defendants' other consent farms have obtained consumer data in substantively the same manner as Defendants' Patriot Refi Website. Defendants have sold consumer data obtained from their other consent farm websites in substantively the same manner as Defendants sold consumer data obtained from their Patriot Refi Website.

<u>**Defendants Sold Falsified Leads That They Misrepresented as Having Been Obtained Through Their Consent Farm Websites**</u>

30. In numerous instances, Defendants sold leads that they misrepresented as having been obtained through their consent farm websites. Defendants took consumer data they had obtained through other sources and falsified metadata to make it look like the consumer data was obtained through their websites. For

example, Defendants sold leads to clients that they claimed were obtained through their websites AgedPeopleMeet.com and ClickToWinAChance.com; however, this was not true and could not possibly have been true, as Defendants did not even create the websites AgedPeopleMeet.com and ClickToWinAChance.com until after such leads were sold to clients.

31.     Doherty controlled, had the authority to control, and participated in Defendants' sale of falsified leads.  For example, despite the fact that AgedPeopleMeet.com and ClickToWinAChance.com had not yet been created, Doherty signed documents attesting to the validity of leads purportedly obtained through these websites.

### Defendants' Methods of Obtaining Consumer Consent to Receive Prerecorded Calls or to Receive Calls on a Telephone Number Listed on the National Do Not Call Registry Do Not Meet the Requirements of the TSR

32.     The TSR requires that, before any outbound telephone call that delivers a prerecorded message is initiated, "*the seller* [must have] obtained from the recipient of the call an express agreement, in writing, that: . . . (iii) [e]vidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages *by or on behalf of a specific seller*."  16 C.F.R. § 310.4(b)(1)(v)(A)(iii) (emphases added).  A "seller" is any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.  *Id*. § 310.2(dd).

33.     The TSR provides that outbound telephone calls may be made to telephone numbers registered with the National Do Not Call Registry when it can be demonstrated that "*the seller* has obtained the express agreement, in writing, of such a person to place calls to that person.  Such agreement shall clearly evidence such person's authorization that calls made *by or on behalf of a specific party* may be placed to that person, and shall include the telephone number to which the calls

may be placed and the signature of that person." 16 C.F.R. § 310.4(b)(1)(iii)(B)(1) (emphases added).

34.     Defendants' method of acquiring consent does not evidence the requisite willingness of consumers to receive calls delivering prerecorded messages "by or on behalf of *a specific seller*," as required by the TSR, 16 C.F.R. § 310.4(b)(1)(v)(A)(iii) (emphasis added), and does not clearly evidence that "the *seller* obtained the express agreement" to place calls "by or on behalf a *specific party*" to consumers whose telephone numbers are registered with the National Do Not Call Registry, as required by the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B)(1) (emphases added).  Given the long lists of entities presented as marketing partners on their websites, Defendants purport they obtained consent on behalf of numerous and various entities, not a specific seller or party.  Further, as Defendants are not a "seller" or legal agents of a "seller," as defined by the TSR, 16 C.F.R. § 310.2(dd), their website forms cannot satisfy the TSR's requirements.  The purported agreements generated from Defendants' "consent farm" websites are a crude attempt to circumvent the TSR's requirements.

## Defendants Have Sold Leads That Are Used to Make Illegal Telemarketing Calls

35.     Defendants have sold leads to clients that initiate, or transfer the leads to other entities that initiate, illegal outbound telemarketing calls.  In numerous instances, these outbound telephone calls delivered robocalls to consumers, who did not consent to receiving them, to sell various products and services to consumers.  In numerous instances, these outbound telephone calls were made to telephone numbers registered with the National Do Not Call Registry.

36.     For example, Defendants sold numerous leads to Digital Media Solutions, LLC ("DMS").  DMS is another lead generator and intermediary.  DMS has sold leads it purchased from Defendants to companies for use in outbound telemarketing campaigns, including campaigns that made robocalls to consumers

who did not consent to receiving calls from the campaigns, including consumers with telephone numbers registered with the National Do Not Call Registry.

37.     As another example, between January 2018 and May 2021, Yodel Technology Services, LLC ("Yodel"), a company that operates a Voice Over Internet Protocol service, among other various telemarketing services, transmitted millions of calls for its clients, almost all of which were robocalls, to consumers based on leads and purported consents that Defendants represented were obtained through their websites.  This chart shows how many sales calls Yodel initiated based on consumer information that Yodel understood was obtained from five of Defendants' websites during the relevant period:

| Defendants' Consent Farm Website | Number of Calls Placed | Number of Calls Placed to Numbers on National Do Not Call Registry |
|---|---|---|
| PatriotRefi.com | More than 85,000 | More than 55,000 |
| AgedPeopleMeet.com | More than 100,000 | More than 40,000 |
| ClickToWinAChance.com | More than 145,000 | More than 60,000 |
| AbodeDefense.com | More than 60,000 | More than 35,000 |
| TheRetailRewards.com | More than 2,775,000 | More than 1,630,000 |

**Defendants Knew That Leads They Sold Resulted in**
**Outbound Telephone Calls**

38.     At all times relevant to the Complaint, Defendants knew or should have known that leads sold from their websites ultimately have resulted in outbound telephone calls, including robocalls and calls made to telephone numbers on the National Do Not Call Registry.  Indeed, Doherty testified that he knew that leads generated from Defendants' websites and subsequently sold to third parties,

-17-

including DMS, were used to initiate outbound telephone calls, including robocalls and calls made to telephone numbers on the National Do Not Call Registry.  In numerous instances, Defendants' lead generation clients explicitly required that the "consent" portion of Defendants' websites contain language regarding "pre-recorded calls.".  Indeed, the block of text on the Patriot Refi Website and others operated by Defendants that is captured in Images 1 and 2 above specifically stated that a consumer may be contacted "by telephone, which may include artificial or pre-recorded calls . . . delivered via automated technology."  Defendants also have known that many, if not all, of their clients and their clients' clients do not and/or did not have pre-existing business relationships with the consumers they called.

## Ongoing Nature of Defendants' Unlawful Practices

39.    Based on the facts and violations of law alleged in this Complaint, Plaintiff has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC because, among other things, Defendants engaged in their unlawful acts and practices repeatedly over a period of several years, Defendants engaged in their unlawful acts and practices knowingly, Defendants continued their unlawful acts and practices despite knowledge of multiple complaints and the FTC's investigation, and Defendants maintain the means, ability, and incentive to continue or resume their unlawful conduct.  Additionally, Defendants' clients continue to make illegal telemarketing calls to consumers, based on leads previously sold by Defendants, and therefore the injury and violations of law caused by Defendants' previous unlawful acts and practices are ongoing.

## VIOLATIONS OF THE FTC ACT

41.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

42.    Misrepresentations or deceptive omissions of material fact constitute

-18-

deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I

### Misrepresentation Regarding Collection of Personal Information

43. In numerous instances, in connection with generating leads for sale to third parties, Defendants have represented, directly or indirectly, expressly or by implication, that they are collecting consumers' personal information, including their phone numbers and email addresses, for the purpose of providing consumers with services such as home refinancing quotes.

44. In truth and in fact, in numerous instances in which Defendants made the representations set forth in Paragraph 43, Defendants did not collect consumers' personal information to provide consumers with services such as home refinancing quotes, but rather for the purpose of selling this information to third parties as leads to assist and facilitate the initiation of illegal telemarketing calls.

45. Therefore, Defendants' representations as set forth in Paragraph 43 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### <u>THE TELEMARKETING SALES RULE</u>

46. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. *See* 16 C.F.R. Part 310.

47. Under the TSR, "telemarketing" is a "plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg). A "telemarketer" is "any person who, in connection with telemarketing, initiates or receives telephone calls to or

from a customer or donor." *Id.* § 310.2(ff). An "outbound telephone call" is "a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution." *Id.* § 310.2(x). A "seller" is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." *Id.* § 310.2(dd).

48.    The TSR prohibits telemarketers and sellers from initiating an outbound telephone call that delivers a prerecorded message ("robocall"), unless the seller has obtained from the recipient of the call an express agreement, in writing, that:

(i)    The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person;

(ii)    The seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

(iii)    Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and

(iv)    Includes the recipient's telephone number and signature.

16 C.F.R. § 310.4(b)(l)(v)(A)(i)-(iv).

49.    The TSR established the National Do Not Call Registry maintained by the FTC, of consumers who do not wish to receive certain types of telemarketing calls. Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at DoNotCall.gov. The TSR prohibits telemarketers and sellers from initiating an outbound telephone call to numbers on the Registry unless the seller (1) has obtained the consumer's express agreement, in writing, to place such calls, or (2)

-20-

has an established business relationship with that consumer, and the consumer has not stated that he or she does not wish to receive such calls.  16 C.F.R. § 310.4(b)(1)(iii)(B).  Such express agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature of that person.  16 C.F.R. § 310.4(b)(1)(iii)(B)(1).

50.     The TSR applies to individuals or companies other than "sellers" or "telemarketers" if these individuals or companies provide substantial assistance or support to sellers or telemarketers.  Specifically, it is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a), (c) or (d), or 310.4 of the TSR.  16 C.F.R. § 310.3(b).

51.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

52.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award monetary civil penalties up to $50,120 for each violation of the TSR assessed after January 11, 2023, including penalties whose associated violation predated January 11, 2023.

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### Count II

### Assisting and Facilitating Violations of the Telemarketing Sales Rule

53.     In connection with the generation and sale of leads to third parties, as described in Paragraphs 8-13, Defendants have provided substantial assistance or support to "sellers" or "telemarketers" engaged in "telemarketing," as defined by

-21-

the TSR, 16 C.F.R. § 310.2.

54.     In numerous instances, in connection with telemarketing, those sellers and/or telemarketers to whom Defendants have provided substantial assistance or support have initiated or caused the initiation of outbound telephone calls that delivered prerecorded messages to induce the sale of goods or services, in violation of 16 C.F.R. § 310.4(b)(1)(v).

55.     In numerous instances, in connection with telemarketing, those sellers and/or telemarketers to whom Defendants have provided substantial assistance or support have initiated or caused the initiation of outbound telephone calls to a person's telephone number on the National Do Not Call Registry in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B).

56.     At all relevant times, Defendants knew or consciously avoided knowing that the sellers and/or telemarketers to whom they provided substantial assistance or support were making the unlawful calls described in Paragraphs 54-55, which violated § 310.4(b)(1)(v) of the TSR.

57.     Defendants' substantial assistance or support, as alleged in Paragraphs 53-56, violates the TSR, 16 C.F.R. § 310.3(b).

## CONSUMER INJURY

58.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

B.     Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this Complaint;

C.     Award Plaintiff monetary civil penalties from each Defendant for each violation of the TSR alleged in this Complaint; and

D.     Award any additional relief as the Court determines to be just and proper.

Dated: January 2, 2024          Respectfully submitted,

**FOR THE FEDERAL TRADE COMMISSION:**

KARINA A. LAYUGAN
MATTHEW H. FINE
JEFFREY TANG
Attorneys
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
(310) 824-4300

**FOR THE UNITED STATES OF AMERICA:**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General, Civil Division

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director, Consumer Protection
Branch

RACHAEL L. DOUD
Assistant Director
Consumer Protection Branch

/s/ *Rowan L. Reid*
ROWAN L. REID
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
Washington, DC 20044-0386
Telephone: 202-532-4315
Email: rowan.l.reid@usdoj.gov